# STATE OF MICHIGAN

# COURT OF APPEALS

DENISE R. KETCHMARK,

Plaintiff-Appellee/Cross-Appellant,

v

ARCHIE L. HAYMAN,

Defendant-Appellant/Cross-Appellee.

UNPUBLISHED
September 15, 2015

No. 321201
Genesee Circuit Court
LC No. 12-305642-DP

Before: MURRAY, P.J., and METER and OWENS, JJ.

PER CURIAM.

The parties to this appeal challenge two trial court orders variously pertaining to certain expenses, parenting time, and child support for one minor child, and revoking the affidavit of parentage of another. First, defendant, Archie L. Hayman, appeals by right the March 18, 2014 order[1] awarding plaintiff, Denise R. Ketchmark, confinement expenses of $12,974.85 under the Paternity Act, MCL 722.711 *et seq*. The expenses relate to medical bills associated with the birth of the parties' son, Damion Michael Ketchmark ("Damion"). Plaintiff cross appeals that same order as it pertains to parenting time and child support for Damion. In addition, Plaintiff cross appeals the trial court's December 13, 2013 order revoking defendant's affidavit of parentage for her daughter, Rakia Renee Ketchmark ("Rakia").

For the reasons set forth below, we vacate the trial court's March 18, 2014 order awarding confinement expenses to the extent it required defendant to reimburse plaintiff for out of network costs and remand the matter to the trial court to determine whether the out of network confinement expenses were reasonable and necessary. Additionally, because the trial court did not consider whether its December 13, 2013 parenting time order changed Damion's established custodial environment, we remand this case for consideration of that issue consistent with this opinion. In all other respects, we affirm both orders.

## I. BACKGROUND

---

[1] The original order requiring confinement expenses was dated February 12, 2014. That order, however, was incorporated into the final order of March 18, 2014.

-1-

The tortured history of this case arises out of the nearly 20-year long extramarital affair between defendant, a circuit court judge, and plaintiff, a practicing lawyer and college professor. Not surprisingly, the parties' accounts of their experiences and circumstances differ drastically. Plaintiff allegedly believed for a number of years that her relationship with defendant was monogamous and exclusive. She hoped eventually to marry defendant. Defendant, on the other hand, recounted the relationship as more casual, albeit sexual in nature. Regardless of these differing accounts, plaintiff learned in 2001 that defendant had married another woman. This was his second marriage. It lasted for less than a year. Plaintiff also heard rumors during this time that defendant was a "womanizer." Despite these discoveries, the parties' relationship continued.

Over the course of their relationship, plaintiff became pregnant at least four times. In 1999, plaintiff gave birth to Rakia. In 2002 and 2004, plaintiff had miscarriages. In 2006, plaintiff gave birth to Damion. Although plaintiff conceived Rakia through artificial insemination, it is unclear when defendant learned of this fact. Plaintiff claims defendant was always aware of Rakia's biological parentage; defendant claims he did not learn the truth until after this lawsuit was filed.

Given defendant's alleged ignorance about Rakia, the parties consistently disputed defendant's child support and parenting obligations to Rakia as well as Damion. Defendant eventually agreed to add them to his health insurance in 2011. By that time, however, the parties' parenting disputes had come to head, with plaintiff essentially accusing defendant of being an absentee father. So, in April 2012, plaintiff urged defendant to "step up to the plate and acknowledge the children" by signing affidavits of parentage as to each. Defendant complied, signing two affidavits of parentage, each drafted and notarized by plaintiff.

Sometime in 2012, defendant became engaged to marry Ernestine Armstrong, with whom he was cohabitating along with their seven-year-old son, Kyle Hayman. Still, defendant continued his sexual relationship with plaintiff, who believed that Armstrong and Kyle were merely defendant's estranged relatives. Upon learning the truth, in July 2012, plaintiff delivered a 52-page letter to defendant graphically recounting the history of their relationship. Defendant alleged plaintiff also sent this letter to his family, friends, professional acquaintances, and then-fiancée.

## II. PROCEEDINGS

The affair persisted until August 17, 2012, when—one week before Defendant's wedding to Armstrong—Plaintiff filed suit under the paternity act and the acknowledgement of parentage act, MCL 722.1001 *et seq*. The complaint, as later amended, requested an order of filiation as to both minor children as well as sole physical and legal custody of them. Based on the affidavits of parentage, plaintiff requested reimbursement of 77 percent of nearly $26,000 in confinement

expenses related to Damion's birth. She also requested child support payments for both children.[2]

Defendant answered, contesting the validity of the affidavits of parentage on grounds of fraud, duress, and improper notarization.[3] Defendant asserted that plaintiff had notarized his signature despite a conflict of interest. Based on this, defendant requested revocation of the affidavits and DNA testing to resolve the paternity issue. Over plaintiff's objection, the trial court ordered DNA testing and stayed discovery pending those results. The court also questioned the validity of the affidavits of parentage, but reserved ruling on that issue.

Several weeks later, DNA tests confirmed that defendant was Damion's biological father, but not Rakia's. The court concluded that the former created a presumption of defendant's paternity as to Damion that rendered his affidavit of parentage as to that child moot. The court entered an order of filiation as to Damion on March 26, 2013, requiring interim child support payments, but granting no parenting time to defendant. Over the ensuing months, defendant filed several motions for reconsideration and for relief from judgment.[4] All were denied, and the issues of confinement expenses, custody, child support, and parenting time as to Damion were adjourned pending resolution of defendant's paternity as to Rakia.

As for Rakia, the court held that despite the DNA test results, defendant's affidavit of parentage may still render him her legal father. The court questioned the validity of the affidavit because plaintiff had been the notary, and she had an interest in the subject matter within the affidavit. As a result, the court set an evidentiary hearing to resolve that issue. In the meantime, defendant sought leave to appeal that determination, arguing that the affidavit was invalid and there was no reason for an evidentiary hearing. Rather than granting leave, this Court—in an order of peremptory reversal—ruled that the affidavit of parentage as to Rakia was valid based on defendant's own admission that he had signed that document. *Ketchmark v Hayman*, unpublished order of the Court of Appeals, entered May 23, 2013 (Docket No. 315960).

Following comments made by the trial court in its January 16, 2013 order, in June 2013, defendant requested that the trial court revoke his affidavit of parentage as to Rakia based on

_____

[2] Plaintiff also requested millions of dollars of relief for intentional infliction of emotional distress, negligence, and fraud—all purportedly caused by Defendant's failure to apprise her of his licentious and unfaithful lifestyle and by her alleged contraction of the human papillomavirus (HPV). However, this Court has already affirmed the trial court's dismissal of those claims under MCR 2.116(C)(8). See *Ketchmark v Hayman*, unpublished opinion per curiam of the Court of Appeals, issued June 17, 2014 (Docket No. 313839).

[3] Defendant's answer contains a "counter claim." However, he alleged no specific cause of action and requested only "appropriate damages."

[4] Defendant variously raised challenges under the paternity act and acknowledgment of parentage act to avoid potentially paying confinement expenses. The crux of his challenges was that his affidavit of parentage (executed under the latter act, which does not provide for confinement expenses) should control his obligations rather than the paternity act.

fraud and misrepresentation. He argued that plaintiff had procured his affidavit despite having conceived Rakia through artificial insemination from a different man. Plaintiff responded with a motion for summary disposition under MCR 2.116(C)(8), claiming that this Court had already deemed the affidavit valid as a matter of law. A hearing ensued over the next few months on the issue of revocation. At its conclusion, the court issued a 19-page opinion and order granting defendant's request.[5]

In reaching this conclusion, the court found that defendant had signed the affidavit of parentage because, as a public figure, he feared both exposure as a "womanizer" and plaintiff's "potential wrath" for his choosing, again, to marry someone else. He was also under emotional duress. The court additionally found that both parties fraudulently executed the affidavit of parentage since both knew defendant was not Rakia's natural father, and they signed the affidavit to gain leverage over each other. Finally, although not required, the court evaluated several of the best interest factors contained in MCL 722.1443(4) (permitting a trial court to consider a child's best interests before entering a judgment revoking paternity), and found the following with respect to each: factor (a) (whether the presumed father is estopped from denying parentage because of his conduct) defendant did not act as an equitable parent; factor (b) (length of time presumed father was on notice that he may not be the child's father) defendant was not the presumed father and had no reason to believe Rakia was his child, especially where Rakia's physical features were similar to plaintiff's Norwegian sperm donor (as opposed to defendant who is black), plaintiff had informed defendant that he was "off the hook" despite having allegedly engaged in unprotected sex with defendant the same day she was artificially inseminated, and because defendant executed the affidavit of parentage under duress; factor (e) (the child's age) keeping the affidavit of parentage in place may cause Rakia emotional harm since she was only 14 years old; factor (f) (harm that may result to the child) keeping the affidavit of parentage in place may entrench Rakia in plaintiff's "overwhelming emotional turmoil" concerning defendant; factor (g) (other factors that may affect the equities from disruption of father-child relationship) no father-child relationship existed to disrupt; and (h) (any other relevant factor) defendant was never a father-figure to plaintiff's children.

Based on these findings, the court (1) determined that keeping the affidavit of parentage in place was not in Rakia's best interests, (2) ordered the affidavit set aside, and (3) extinguished defendant's obligations to that child. As noted previously, this is one of two orders on which plaintiff eventually based her cross appeal.[6]

With Rakia's paternity resolved, the trial court returned to the previously adjourned issues regarding Damion. As for confinement expenses, plaintiff had already presented affidavits detailing her claimed expenses with medical bills attached. Plaintiff claimed this was the only proof of expenses in existence when Damion was born. She additionally averred that

---

[5] Plaintiff's motion under MCR 2.116(C)(8) was apparently denied, although no order or hearing transcript on that motion appears in the record before us.

[6] Plaintiff originally filed a claim of appeal regarding this order, but it was dismissed for lack of jurisdiction since the order was not a final one. *Ketchmark v Hayman*, unpublished order of the Court of Appeals, entered January 28, 2014 (Docket No. 319812)

those expenses—which she paid—were medically necessary and not otherwise discharged or covered by insurance. On January 31, 2014, defendant submitted his answer to plaintiff's confinement expenses and supplements, arguing as he had before that the acknowledgement of paternity act (which does not provide for confinement expenses) rather than the paternity act governed this case.

On February 12, 2014, the court ordered defendant to reimburse plaintiff $12,974.85. This represented his equal share of the $25,949.69 of the total confinement expenses that plaintiff had claimed. The trial court found plaintiff had shown the expenses were reasonable and necessary and were not otherwise reimbursed or discharged by insurance. The court determined an equal apportionment was appropriate where neither party had made any effort to establish Damion's legal paternity from 2006 through 2012. Additionally, the court found plaintiff's failure to use defendant's health insurance card for Damion in 2008 was irrelevant since defendant had no legal obligation to support Damion at that time.

Defendant subsequently sought clarification of this order, arguing that plaintiff had failed to prove she had paid those confinement expenses, but that motion was denied. Then, despite discovery having been closed for over a year, defendant issued subpoenas to plaintiff's medical providers seeking proof that plaintiff had paid confinement expenses. Those subpoenas were eventually quashed.

With the issue of confinement expenses resolved, the court then issued an opinion and order on March 18, 2014, concerning parenting time and child support. Regarding the former, the court concluded that awarding parenting time to defendant was in Damion's best interests in light of Damion having recently learned that defendant is his father as well as defendant's "therapeutic and sporadic" parenting time visits with him.

As for the best interest factors contained in MCL 722.23,[7] the court found as follows: factor (a) (love affection and emotional ties between the parties and the child) was credited equally to both parties where plaintiff has been Damion's primary caregiver and Damion had otherwise responded well to recent parenting time visits with defendant; factor (b) (capacity of the parties to provide the child with love, guidance and to continue the child's education and religious development, if any) was credited to both parties where both supported Damion's Catholic education and defendant assisted with cub scout activities; factor (c) (capacity of the parties to provide the child with necessities) was credited equally to both parties where both provided Damion with basic necessities, defendant's health insurance covered Damion, and defendant was available to assist with child care; factor (d) (time and continuity in a satisfactory environment) was credited to plaintiff given the stable environment she has provided Damion, although the court anticipated Damion would thrive as both parties provide for his needs; factor (e) (permanence as a family unit of the existing custodial home) was credited to plaintiff, who is raising two children as opposed to defendant who is with his third wife in a three bedroom apartment with another child; factor (f) (parties' moral fitness) was credited equally to both

---

[7] These best interest factors control, in part, a court's decision regarding parenting time under MCL 722.27a(1).

parties where neither has a criminal record, defendant goes to church on Sundays and has no drug or alcohol problems, and the parties' torrid history need not negatively affect Damion; factor (g) (parties' mental and physical health) was credited equally to both parties where neither testified to having any physical or mental limitations and defendant was in excellent shape; factor (h) (the child's home, school, and community record) was credited to plaintiff who as primary caregiver has established Damion's home, school, and community record, although defendant's home was suited for another child and defendant was willing to assist with Damion's education; factor (i) (child's preference) was credited equally to both parties where Damion was excited to have defendant as a father, although his established custodial environment was with plaintiff; factor (j) (willingness to facilitate and encourage a close and continuing parent-child relationship between the child and other parent) was credited to defendant where defendant did not interfere with the mother-son relationship, but plaintiff involved Damion in this dispute by, among other things, showing him the affidavits of parentage and informing Damion that Ernestine sought a personal protection order (PPO) against plaintiff; factor (k) (domestic violence) was credited to defendant where Damion had witnessed plaintiff throw a box that hit Kyle and plaintiff had otherwise sent inappropriate things to defendant's wife such as the 52-page letter described previously.

The court also considered the factors contained in MCL 722.27a(6) and found the following as to each relevant factor: factor (a) (special circumstances or needs of the child) no concerns with Damion's fitness; factor (c) (abuse or neglect of the child) no likelihood of abuse or neglect by defendant; factor (e) (inconvenience to the parties) the parties' travel time was of negligible importance; factor (f) (parent will reasonably exercise parenting time in accordance with the court order) defendant was likely to comply with court ordered parenting time despite concerns that plaintiff would "set him up" if they parented together; factor (g) (frequent failure to exercise parenting time) a parenting time order would clarify parenting time disagreements; and factor (i) (other relevant factors) plaintiff's concerns about defendant's wife and her sister, whom plaintiff thought was a drug addict, were unfounded where the sister lived out of state.

Accordingly, the court found it in Damion's best interests to award plaintiff sole legal custody and primary residence, while permitting defendant access to Damion's health and educational information. The court also set forth a specific parenting time schedule, which included 140 overnights of parenting time to defendant, among other things. Defendant was also required to pay child support of $1,142 a month and to cover 64 percent of Damion's uninsured medical allocation. The order likewise reiterated the imposition of confinement costs noted previously of $12,974.85.

Within weeks after this final order's entry, defendant filed his claim of appeal. Plaintiff subsequently filed her cross appeal in which she challenged this same order as well as the previous December 13, 2013 order revoking defendant's affidavit of parentage as to Rakia. We now turn to the merits of those appeals.

## III. DEFENDANT'S APPEAL

Defendant argues that the trial court erred in requiring him to pay plaintiff half of the total confinement expenses absent proof that she, herself, paid them.[8] The trial court awarded confinement expenses under the paternity act, and so our analysis concerns issues of statutory interpretation. We review such questions of law de novo. *State Farm Fire & Cas Co v Corby Energy Servs, Inc*, 271 Mich App 480, 483; 722 NW2d 906 (2006). To the extent the statute expressly provides the trial court discretion to identify the recipient of those expenses, see MCL 722.712(2)(b), we must determine whether the trial court's ultimate decision fell outside the range of reasonable and principled outcomes, i.e., whether the trial court abused its discretion. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). We review the court's factual findings for clear error. *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463, 472; 719 NW2d 19 (2006). "[F]actual findings are clearly erroneous where there is no evidentiary support for them or where there is supporting evidence but the reviewing court is nevertheless left with a definite and firm conviction that the trial court made a mistake." *Hill v City of Warren*, 276 Mich App 299, 308; 740 NW2d 706 (2007).

## A. CONFINEMENT EXPENSES

The paternity act's plain language requires a trial court to apportion between parents of a child born out of wedlock the reasonable and necessary medical expenses connected to the child's birth—known as confinement expenses—based on each parent's ability to pay. MCL 722.712(1) and (2); see *Fellows v Mich Comm for the Blind*, 305 Mich App 289, 297; 854 NW2d 482 (2014) (stating that plain, unambiguous statutory language must be enforced as written). In addition, where one parent has already paid those expenses, the court has discretion to require the parent who did not pay to reimburse the other parent. MCL 722.712(2)(b). As MCL 722.712 provides in relevant part:

(1) The parents of a child born out of wedlock are liable for all of the following:

\* \* \*

(b) The medical expenses connected to the birth of the child.

\* \* \*

(2) Subject to subsection (3), if medicaid has not paid a medical expense described in subsection [(1)(b)], on request from a parent, the court in an action brought under this act shall do all of the following:

---

[8] Plaintiff requests this Court award her all confinement expenses, not just half. However, because she filed no cross appeal on this ground, her request that we order such relief is improper. See MCR 7.207; *In re Herbach Estate*, 230 Mich App 276, 284; 583 NW2d 541 (1998) (an appellee may not seek relief more favorable than the relief obtained below without filing a cross appeal). Regardless, because we conclude the trial court erred, plaintiff's request is moot.

> (a)  If the court determines the expense to be reasonable and necessary, apportion the expense between the parents based on each parent's ability to pay and on any other relevant factor, in the same manner as health care expenses of a child are divided under the child support formula established under section 19 of the friend of the court act, 1982 PA 294, MCL 552.519.
>
> (b)  In the court's discretion, if 1 parent has paid the expense, require the parent who did not pay the expense to pay his or her share of the expense to the other parent.[9]

See also MCL 722.717(2) (cross referencing MCL 722.712 in providing that orders of filiation must provide for expenses connected to the birth of a child).[10]

Here, the court's basis for requiring defendant's payment of confinement expenses to plaintiff was that her expenses were reasonable and necessary, and not otherwise covered by insurance. The court made no explicit finding that plaintiff had actually paid these expenses. Before proceeding, it bears emphasis that except for medical expenses apparently incurred outside of plaintiff's insurance network,[11] defendant does not challenge the necessity of the confinement expenses. Instead, defendant focuses on whether he owes plaintiff the money. Plaintiff counters that her affidavits, complaint, amended complaint, motion and brief for confinement expenses, and her medical bills met her burden of proof. We will address each in turn.

Plaintiff's affidavits show the outstanding amount due for confinement expenses was reduced over time, and that plaintiff, herself, paid either the difference owed after insurance or that she paid the expenses in the absence of insurance. Indeed, in her Supplement to Affidavit in Support of Cost of Confinement Expenses, plaintiff states that "the bills were actually paid by me." Defendant did not offer any evidence to rebut this sworn testimony. As such, we reject

---

[9] Defendant's impugning of the trial court for proceeding under the paternity act is of no moment. Indeed, although defendant correctly observes that proceedings should not commence under that act where an affidavit of parentage has been executed under the acknowledgment of parentage act, see MCL 722.714(2), the trial court found defendant's affidavit as to Damion moot after defendant requested DNA tests. See MCL 722.716(1). Regardless, defendant concedes that plaintiff could have sought confinement expenses under the family support act, MCL 552.451 *et seq*. That act expressly permits a plaintiff to seek recovery of such expenses consistent with the prescriptions of the paternity act. MCL 552.452(2). Our analysis of this issue therefore properly proceeds under the paternity act.

[10] Given this cross reference, plaintiff's request that we read these sections *in pari materia* merely restates what that statute already requires.

[11] See *Thompson v Merritt*, 192 Mich App 412, 423; 481 NW2d 735, (1991) (stating that "costs of confinement that arose because the mother chose not to use a facility covered by her health insurance were unnecessary expenses that should not be imposed on defendant.").

-8-

defendant's argument that a remand is necessary for a determination of whether plaintiff paid these expenses. The undisputed evidence is that she did. However, the trial court made no determination as to whether plaintiff's out-of-network costs were reasonable and necessary.[12] *Thompson v Merrit*, 192 Mich App 412, 423; 481 NW2d 735 (1991). In the absence of such a finding, ordering that portion of the costs was an abuse of discretion.

In reaching this conclusion, we emphasize that our ruling only affects the amount defendant owes plaintiff, for defendant does not challenge the calculation of confinement expenses for which he is liable (with the exception of the apparent out-of-network costs already noted). Indeed, he concedes plaintiff's bills are prima facie evidence that medical expenses were incurred, MCL 722.712(7), and as we have concluded, the undisputed evidence is that plaintiff paid the bills at issue. Except for out-of-network costs, then, that portion of the trial court's ruling apportioning defendant's share of confinement costs remains intact. Therefore, we vacate the order only to the extent it improperly required defendant to reimburse plaintiff for out of network costs, and remand for further findings on that issue.

Before moving on, we briefly address defendant's constitutional argument—specifically, that the trial court denied him procedural due process by awarding confinement expenses without conducting an evidentiary hearing. Parties in civil cases are certainly entitled to procedural due process; however, that requirement pertains to notice of the proceedings and the opportunity to be heard by an impartial decision maker. *Cummings v Wayne Co*, 210 Mich App 249, 253; 533 NW2d 13 (1995). This includes the opportunity to learn and respond to evidence, although a full trial-like proceeding is unnecessary. *Id*. Here, although the trial court conducted no evidentiary hearing on confinement expenses, defendant was aware of all of plaintiff's evidence and even filed a response to it. In other words, defendant was allowed "the chance to know and respond to the evidence." *Id*. The fact that the trial court awarded confinement expenses to plaintiff without an evidentiary hearing does not mean defendant was denied due process.

## IV. PLAINTIFF'S CROSS APPEAL

Plaintiff's cross appeal raises numerous issues concerning the revocation of defendant's affidavit of parentage as to Rakia and also regarding parenting time, custody, and child support for Damion. We conclude that although the court correctly revoked the affidavit and awarded child care expenses, it otherwise failed to determine whether its parenting time order changed Damion's established custodial environment.

### A. REVOCATION OF PATERNITY AS TO RAKIA UNDER MCL 722.1431 *et seq.*

---

[12] Defendant argues that plaintiff's seeking reimbursement for her Bioscrip bill is improper, considering that Bioscrip confirmed (1) that defendant tendered partial payments to Bioscrip and (2) that plaintiff's payments came from a joint checking account. However, defendant received this information pursuant to a subpoena that the trial court later quashed. Consequently, this information is not properly before us.

Plaintiff challenges the revocation of defendant's paternity as to Rakia on multiple grounds. The court entered its order under the Revocation of Paternity Act, MCL 722.1431 *et seq*. That act provides trial courts several methods to revoke paternity, including the setting aside of acknowledgments of parentage. *Glaubius v Glaubius*, 306 Mich App 157, 165; 855 NW2d 221 (2014), lv gtd 497 Mich 929 (2014). We review a trial court's findings on this issue for clear error. *In re Moiles*, 303 Mich App 59, 65-66; 840 NW2d 790 (2013), rev'd in part on other grounds 495 Mich 944 (2014). However, we review underlying issues related to the interpretation and application of the revocation of paternity act de novo. *Id*. To the extent the court made factual findings in addressing the best interest factors set forth in MCL 722.1443(4), and in determining the sufficiency of defendant's affidavits supporting revocation, our review is for clear error. *Id*.

## 1. THE REVOCATION OF PATERNITY ACT

Actions to set aside an acknowledgment of parentage are governed by MCL 722.1437. *Id*. at 66. That section specifically permits certain individuals, including an acknowledged father like defendant,[13] to seek revocation of an acknowledgment of parentage within three years of the child's birth or one year after the date he signed the acknowledgment—whichever is later—unless the action commenced before June 12, 2013. MCL 722.1437(1). The request must be accompanied by a supporting affidavit stating facts that establish one of the following:

(a) Mistake of fact.

(b) Newly discovered evidence that by due diligence could not have been found before the acknowledgment was signed.

(c) Fraud.

(d) Misrepresentation or misconduct.

(e) Duress in signing the acknowledgment. [MCL 722.1437(4).]

If the affidavit is sufficient, the court must order the DNA identification profiling provided by the Paternity Act. MCL 722.1437(5). Under the Paternity Act, a DNA test revealing a probability of paternity of 99 percent or greater presumptively establishes paternity. MCL 722.716(5). But under the Revocation of Paternity Act, DNA test results are not binding and serve only "to assist the court in making a determination . . . ." MCL 722.1443(5). The best interest factors contained in MCL 722.1443(4), which the trial court considered in this case, also may assist the court in making a determination on this issue regardless of the DNA test results. *Helton v Beaman*, 304 Mich App 97, 123; 850 NW2d 515 (2014) (K.F. KELLY, J., concurring). Since the Acknowledgment of Parentage Act and the Paternity Act deal with the same subject matter, we construe these statutes *in pari materia*. *Moiles*, 303 Mich App at 69.

---

[13] An acknowledged father is "a man who has affirmatively held himself out to be the child's father by executing an acknowledgement of parentage under the acknowledgment of parentage act." MCL 722.1433(a).

## 2. REVOCATION OF PATERNITY WAS PROPERLY BEFORE THE TRIAL COURT

As a preliminary matter, plaintiff variously argues that the issue of revocation was not properly before the trial court because (1) defendant never filed a formal petition of revocation, (2) even if defendant requested revocation, the request was late, (3) the trial court never found defendant's affidavits sufficient before ordering DNA testing, (4) the court had already deemed defendant to have admitted that the affidavit was proper, and (5) this Court previously found defendant's affidavit of parentage as to Rakia valid.

We address these arguments in order. First, defendant quite clearly requested that the trial court revoke his affidavits of parentage in his notarized answer to plaintiff's first amended complaint.[14] See MCL 722.1437(7) (permitting revocation proceedings to commence during an existing action). Plaintiff does not contend service was improper or that the request was vague, and did not move to strike that portion of the answer below. In fact, issues surrounding these affidavits were clearly before the trial court throughout the entirety of the proceedings. Under these circumstances, defendant's request to revoke his affidavits of parentage was sufficient, especially where that request was supported in four affidavits. See *Adams v Adams*, 100 Mich App 1, 18; 298 NW2d 871 (1980) (but for the failure to verify the answer in a custody dispute, the answer was sufficient to place the defendant's request for relief before the trial court where the pleading was not so vague that the plaintiff could not respond and where the plaintiff otherwise did not file a motion to strike that portion of the defendant's pleading).

Second, defendant's request was timely since it was filed on September 26, 2012, i.e., before the deadline set forth in MCL 722.1437(1). That it was otherwise filed within three years of his signing the affidavits of parentage in 2011, although unnecessary, only further reveals that plaintiff's argument on this ground is baseless.

Third, in ordering the DNA tests, the trial court expressly proceeded under the Paternity Act as pleaded in the alternative by plaintiff, not the Acknowledgment of Parentage Act. The former specifically allows a trial court to order DNA testing on request from any party or on its own initiative, see MCL 722.716(1), and defendant unequivocally requested DNA testing in his answer. Accordingly, a finding on the sufficiency of the affidavit was not a prerequisite to the trial court's ordering DNA testing.

Fourth, the fact that the court deemed as admitted plaintiff's requests to admit does not sink defendant's attempt at revocation. Indeed, all defendant admitted was that *at the time he signed the affidavit*, he did so believing its contents were true and that such an affidavit was an appropriate vehicle to acknowledge parentage. But admitting these facts does nothing more than establish the predicate for defendant's case, i.e., that he was defrauded into signing this affidavit

---

[14] Although the record does not reveal defendant's oral motion on this score, as he argues on appeal, the record does show that the court permitted defendant to amend his request to revoke his affidavit as to Rakia. However, nowhere in its opinion does the trial court hold that defendant's request to revoke was otherwise insufficient thereby precluding any request for revocation as plaintiff suggests.

based on plaintiff's misrepresentations. This does not conclusively defeat his request to revoke that same affidavit.

Fifth, in claiming that this Court's prior order as to the affidavit's validity precluded consideration of revocation, plaintiff has conflated two distinct concepts. The former issue (validity)—which this Court reviewed—pertains to establishing the validity of an affidavit acknowledging parentage under the Acknowledgement of Parentage Act, MCL 722.1003(2). Under that framework, proper notarization is the seminal issue. In contrast, the Revocation of Paternity Act expressly provides the mechanism by which an acknowledged father may revoke parentage, MCL 722.1437. Specific allegations of misconduct as well as the potential consideration of the best interest factors are key in that analysis. Thus, although both acts pertain to the efficacy of an affidavit, they address separate questions. See *Helton*, 304 Mich App at 115-117 (K.F. KELLY, J., concurring) (observing that the Acknowledgment of Parentage Act and Revocation of Paternity Act provide distinct frameworks with different goals, i.e., to establish paternity and to revoke paternity). Accordingly, this Court's resolution of the affidavit's validity has no bearing on whether defendant may revoke that affidavit in this case.

### 3. WAS REVOCATION PROPER?

Plaintiff next argues at length that revocation was improper where defendant's supporting affidavits failed to establish any of the criteria contained in MCL 722.1437(4). Defendant counters that he established all of these criteria. However, both parties' arguments are misplaced given the unique posture of this case in which the court never made any findings as to the sufficiency of defendant's supporting affidavits in the first place. The reason the court never made these findings—which are a prerequisite to DNA testing under the Revocation of Paternity Act—is because the court initially proceeded under the Paternity Act.[15] It was only after receiving the DNA test results ordered pursuant to that act (and an order from this Court determining the affidavit of parentage as to Rakia valid under the Acknowledgment of Parentage Act) that the court turned to the issue of revocation, made findings of fact, and revoked the affidavit of parentage as to Rakia.

Notably, while the court's findings mirrored some of the criteria set forth in MCL 722.1437(4), the court considered evidence beyond merely defendant's supporting affidavits. This evidence included testimony at evidentiary hearings[16] and plaintiff's 52-page letter. Based on this, the court concluded *both* parties were guilty of misconduct, fraud, and deceit. In support, the court elaborated that both knew defendant was not Rakia's biological father when

---

[15] Although actions should not commence under the Paternity Act where a father has acknowledged parentage, see MCL 722.714(2), plaintiff pleaded her claims under that act in the alternative. Moreover, she does not argue that the trial court erred in ordering DNA testing under the Paternity Act because an affidavit of parentage existed. Rather, she claims defendant did not properly request revocation or DNA testing. We therefore need not consider this procedural anomaly.

[16] The transcripts of these hearings do not appear in the record before us. Nevertheless, sufficient evidence exists in the record to review the court's findings.

they signed the affidavit of parentage, but that they signed it anyway to gain leverage against each other. The court also found that the parties used the affidavit of parentage as a negotiating tool. The court found that plaintiff sought to further her relationship with defendant and to entrap him in a parental relationship with Rakia, while defendant desperately wanted to keep the situation secret and signed the affidavits under duress to appease plaintiff.

Although the record before us is riddled with factual inconsistencies on each of these matters,[17] we are not left with a definite and firm conviction that a mistake was made by the court. In his answer to plaintiff's first amended complaint, defendant admitted that he signed the affidavits of parentage *since no father had claimed paternity. Angott v Chubb Group of Ins Cos,* 270 Mich App 465, 470; 717 NW2d 341 (2006) ("[A] party is bound by its pleadings."). He further averred he was aware that plaintiff had represented to the children that defendant was their "friend." This, of course, contradicts defendant's claimed belief that Rakia was his child based on plaintiff's representations. Plaintiff's 52-page letter also confirms the court's findings as it graphically contrasts her disillusioned, 20-year pursuit of a more serious, committed relationship with defendant's desire that the relationship remain surreptitiously open. Plaintiff further stated in her own affidavit that the parties signed the affidavit of parentage as part of their "negotiations." Defendant corroborated this, elaborating in his own affidavits that plaintiff pressured him by alerting the news media and threatening to harm his career, among other things, if he did not sign.

While plaintiff may be correct that these facts do not necessarily satisfy the formal standards of fraud and misrepresentation, or even the technical requirements of presenting newly discovered evidence, they minimally establish misconduct. See *Black's Law Dictionary* (7th ed), p 1013 (defining "misconduct," in part, as "unlawful or improper behavior."). When this is coupled with the DNA evidence confirming that defendant is not Rakia's biological father, we cannot conclude that the trial court clearly erred in determining that the evidence clearly and convincingly supported revocation. See MCL 722.1437(5) (requiring clear and convincing evidence to support revocation of an acknowledgment of parentage).[18]

The trial court's best interest's determination only cements our conclusion. The court's findings are detailed and, importantly, their factual basis is not challenged by plaintiff. Instead, plaintiff attacks the legal basis for those findings in the first instance, arguing that a trial court may only consider the best interest factors when *declining* to revoke parentage. But MCL 722.1443's plain language expressly permits trial courts to consider the best interest factors in revocation of paternity cases. *Helton*, 304 Mich App at 124 (K.F. KELLY, J., concurring) ("the relevant factors listed in MCL 722.1443(4) are to be considered in any action brought under the

---

[17] For example, defendant avers that he did not believe Rakia was his biological child, while plaintiff maintains that defendant testified he was not under duress when he signed the affidavit.

[18] Plaintiff is correct that the trial court's reliance on *Moiles*, 303 Mich App 59, was improper where our Supreme Court determined that a party's knowledge about a child's biological father does not preclude that party from subsequently signing an affidavit of parentage. See *Moiles*, 495 Mich at 945. Nevertheless, the trial court's ultimate conclusion was not clearly erroneous given that both parties were guilty of misconduct.

RPA regardless of how paternity was established."). The fact that the court did not rule in plaintiff's favor and determine that revocation was not in Rakia's best interests, then, does not mean the court erroneously considered those factors. It just means that trial court's review of this matter was thorough.[19] The court did not err in revoking defendant's affidavit of parentage as to Rakia.

## B. PLAINTIFF'S MOTION UNDER MCR 2.116(C)(8)

Plaintiff asserts the trial court should have dismissed defendant's request to revoke the affidavit of parentage as to Rakia under MCR 2.116(C)(8). She raises this issue on two grounds: first, that defendant did not properly request revocation, and second, that the court lacked subject matter jurisdiction because defendant's supporting affidavits failed to allege any of the criteria contained in MCL 722.1437(4). We review de novo the denial of a motion under that subrule. *Dalley v Dykema Gossett*, 287 Mich App 296, 304; 788 NW2d 679 (2010).

As for plaintiff's first argument, we have already concluded that defendant properly requested revocation of the affidavit of parentage. And as for plaintiff's second argument, defendant expressly alleged misconduct, mistake of fact, and duress in his revised affidavit. Thus—setting aside that the standard under (C)(8) precludes a court from looking beyond the pleadings (as plaintiff does here)[20]—plaintiff's motion under subrule (C)(8) was baseless.

## C. CONSTITUTIONAL VIOLATIONS

Plaintiff's final thrust in contesting the revocation of paternity as to Rakia is an alleged constitutional violation. Specifically, plaintiff claims the court denied Rakia due process and equal protection of the law in revoking defendant's parentage as to her. It does not appear plaintiff elaborated this argument below, therefore our review is for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999); *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000).

As a preliminary matter, we note that it is unclear whether plaintiff even has standing to assert this issue since she brings it solely on Rakia's behalf. Notwithstanding, aside from her reliance on unrelated, foreign case law, the thrust of plaintiff's argument appears to be that the trial court treated the affidavits of parentage as to Damion and Rakia differently because of the manner in which Rakia was conceived. But the trial court did not even reach the merits of defendant's request to revoke the affidavit as to Damion. Instead, the court ruled that the

---

[19] Although the trial court did not expressly find defendant's supporting affidavit sufficient before ordering DNA testing, the court's ultimate finding that misconduct in fact occurred is support by defendant's affidavits. Accordingly, the trial court did not run afoul of our Supreme Court's conclusion in *Moiles*, which held that consideration of the best interest factors of MCL 722.1437(4) is inappropriate where the supporting affidavit fails to meet the threshold requirement of sufficiency under MCL 722.1437. *Moiles*, 495 Mich at 945.

[20] *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999) (resolution of motions under MCR 2.116(C)(8) is limited to review of the pleadings alone).

affidavit as to Damion was moot in light of the DNA test results revealing defendant to be his biological father. Defendant did not contest that determination, and no further ruling was made on that issue. Regardless, while plaintiff is correct that under the Acknowledgment of Parentage Act Damion and Rakia were similarly situated to defendant upon his execution of the affidavits of parentage (i.e., those affidavits established his paternity as to both, MCL 722.1004), she ignores that the Revocation of Paternity Act operates independently and provides a specific means to set aside parentage. *Helton*, 304 Mich App at 115-117 (K.F. KELLY, J., concurring).

Moreover, the Revocation of Paternity Act makes no distinction between children conceived naturally or artificially, see MCL 722.1433 (defining various forms of fatherhood without reference to the means of a child's conception). Finally, and most importantly, the court's basis for concluding Damion's affidavit moot was the DNA test results confirming Damion was defendant's biological child. However, even with DNA test results indicating that Rakia was *not* defendant's biological child, the court did not revoke parentage as to her on this basis. Rather, the court held that defendant may still be Rakia's natural father—despite the fact that he was not her biological father—depending on the outcome of his revocation of paternity action. In other words, the fact that Rakia was not defendant's biological child had no effect on the application of the law to her. We therefore fail to discern how Rakia's constitutional rights were violated in this case. See *Struble v Detroit Auto Inter-Ins Exch*, 86 Mich App 245, 253; 272 NW2d 617 (1978) ("equal protection of the law does not prevent, and it is not violated by, a reasonable classification by legislative enactment if it applies alike to all persons within such class and reasonable grounds exist for making the distinction between those who fall within such class and those who do not.").

## D. PARENTING TIME AS TO DAMION

Turning to parenting time, plaintiff accuses the trial court of changing Damion's established custodial environment by awarding defendant 140 overnights of parenting time. "Although appellate review of parenting-time orders is de novo, this Court must affirm the trial court unless its findings of fact were against the great weight of the evidence, the court committed a palpable abuse of discretion, or the court made a clear legal error on a major issue." *Berger v Berger*, 277 Mich App 700, 716; 747 NW2d 336 (2008), citing MCL 722.28 and *Borowsky v Borowsky*, 273 Mich App 666, 688; 733 NW2d 71 (2007).

MCL 722.27 empowers a trial court in custody disputes to provide for reasonable parenting time and to modify parenting time orders. Key to the modification of a parenting time order is whether the modification changes the child's established custodial environment.[21] If the proposed parenting time adjustment would alter the child's established custodial environment, the proponent must present clear and convincing evidence that the change is in the child's best interests. *Pierron v Pierron*, 486 Mich 81, 86; 782 NW2d 480 (2010). However, if the change does not alter the child's established custodial environment, the moving party need only prove by

---

[21] The established custodial environment is the environment in which "over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c).

a preponderance of the evidence that the altered parenting-time schedule promotes the child's best interests. *Shade v Wright,* 291 Mich App 17, 23; 805 NW2d 1 (2010). "While an important decision affecting the welfare of the child may well require adjustments in the parenting time schedules, this does not necessarily mean that the established custodial environment will have been modified." *Pierron,* 486 Mich at 86. Thus, modifications to parenting time do not change the established custodial environment where those adjustments do not change the person to whom the child naturally looks for guidance, discipline, the necessities of life, and parental comfort. *Id.*

Here, the trial court's custody and parenting time order consisted exclusively of a thorough review of the best interest factors of MCL 722.23 and MCL 722.27a(6). Plaintiff challenges many of those findings by noting that contradictory evidence exists in the record. But it is the trial court's role to resolve such conflicts, not plaintiff's, and in any event, these ultimately have no bearing on which parent Damion looks to for guidance, discipline, the necessities of life, and parental comfort.[22]

In any event, although the court made no initial findings as to Damion's established custodial environment, the court indicated throughout its analysis that Damion's established custodial environment was with plaintiff, who ultimately retained legal custody and primary residence. The problem, however, is that the court made at least one finding that appears to change that established custodial environment. Specifically, the court noted that although defendant's role in Damion's life was "ancillary" prior to this litigation, the court found that "in time Damion will thrive as both parties provide independent, stable, and satisfactory environments for Damion's health, education, and maintenance." Notably, this finding was made with respect to MCL 722.23(d), which pertains, in part, to the desirability of maintaining continuity.

Considering that the court anticipated the advent of future, independent environments for Damion, the finding appears to acknowledge that Damion's established custodial environment will change, at least in part, based on the court's parenting time order. But the court made no findings on this score, and in failing to do so, did not determine the proper evidentiary burden. This was erroneous. On remand, then, the court should determine whether its parenting time order changed Damion's established custodial environment, and if so, whether clear and convincing evidence warrant such a change.

### E. HEALTH CARE AND CHILD SUPPORT

Plaintiff's final challenge is to the court's calculation of health care and child support expenses. "We review for clear error a trial court's factual findings underlying a particular child-support award." *Wright v Wright,* 279 Mich App 291, 305; 761 NW2d 443 (2008).

---

[22] Plaintiff makes much of the trial court's failure to consider defendant's alleged "criminal acts." However, the evidence she cites supports none of these contentions.

As for health care costs, plaintiff maintains the trial court incorrectly reduced defendant's child support payment by crediting his monthly health insurance premium of $188.10. She claims this was erroneous because "there was testimony" that defendant's premium included his wife and other son, Kyle, in addition to Damion and himself. However, plaintiff's generic reference to testimony, without more, is insufficient. Indeed, a party must support facts "by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court." MCR 7.212(C)(7). "We will not search the record for factual support for plaintiffs' claims." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 388; 689 NW2d 145 (2004).[23]

Lastly, plaintiff asserts two clerical errors in the trial court's child support calculations. First, plaintiff claims the court's calculations failed to take account for defendant's 64 percent share of the payments. However, the trial court's order expressly holds defendant liable for 64 percent of Damion's uninsured medical costs; that ratio is not otherwise employed in the order. Second, plaintiff argues the trial court erred by classifying defendant as filing a joint tax return with three dependents. But the evidence plaintiff cites in support is equivocal on this point (defendant testified he was unsure whether he would file a joint tax return with his wife). Reversal is not required.

V. CONCLUSION

We vacate the trial court's March 18, 2014 order awarding confinement expenses to the extent it required defendant to reimburse plaintiff for out of network confinement expenses, and remand the matter to the trial court to determine whether those confinement expenses were reasonable and necessary. Additionally, because the trial court did not consider whether its December 13, 2013 parenting time order changed Damion's established custodial environment, we remand this case for consideration of that issue consistent with this opinion. In all other respects, we affirm both orders.

No costs, neither party having prevailed in full. MCR 7.219. We do not retain jurisdiction.


/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Donald S. Owens

---

[23] Likewise, we decline to resolve for plaintiff whether defendant should have produced his pay stubs during discovery. Indeed, the only discovery order plaintiff cites in this regard is the trial court's initial order of October 12, 2012, staying discovery pending the DNA test results. But this order did not deal with the subsequent motions to compel plaintiff claims she filed. If plaintiff believes those motions were wrongly denied, she should have appealed the order pertaining to those motions in the first instance. Her failure to do so precludes our review of this issue now.